**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **BILLY MILES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:23-CV-03568-MAB** |
| | ) | |
| **DAVID W. MITCHELL, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM AND ORDER**

**BEATTY, Magistrate Judge:**

This matter is before the Court on Defendant Percy Myers' motion for summary judgment (Docs. 36, 37) and Plaintiff's motion for counsel (Doc. 41). For the reasons discussed below, Plaintiff's motion for counsel (Doc. 41) is DENIED and the motion for summary judgment (Doc. 36) is GRANTED.

## BACKGROUND

Plaintiff Billy Miles is an inmate of the Illinois Department of Corrections. Plaintiff is currently incarcerated at the Joliet Treatment Center (Doc. 35). Plaintiff brought this *pro se* action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights while incarcerated at Pinckneyville Correctional Center ("Pinckneyville"). Specifically, Plaintiff alleges that Percy Myers, M.D. ("Dr. Myers") violated his Eighth Amendment rights by failing to provide Plaintiff with a low bunk/low gallery permit and failing to properly treat Plaintiff's clogged artery (Doc. 1, Doc. 10).

Following a threshold review of Plaintiff's Complaint pursuant to 28 U.S.C. § 1915A, the Court allowed Plaintiff to proceed on the following claim against Dr. Myers:

> **Count 1:** Eighth Amendment deliberate indifference claim against Dr. Percy Myers for failing to provide Miles with a lower bunk, lower deck permit and for failing to properly treat his clogged artery.

(Doc. 10). All other claims and defendants were dismissed without prejudice (*Id.*).

## FACTS

Plaintiff arrived at Pinckneyville on or around November 1, 2021 (Doc. 37-1, p. 2). On December 14, 2021, Dr. Myers saw Plaintiff for the first time for complaints of pain and swelling in Plaintiff's left leg (*Id.* at 76). Dr. Myers suspected that Plaintiff had deep vein thrombosis ("DVT") in his leg (*Id.*). DVT occurs when a blood clot forms in a vein, usually in the legs, causing leg pain or swelling (*Id.* at 2). That same day, Dr. Myers ordered labs and sent Plaintiff to Pinckneyville Community Hospital to be tested for DVT (*Id.* at 79, 540). The hospital confirmed that Plaintiff had DVT in his left lower extremity and that it was not a blocked or clogged artery (*Id.*, at 542-43). Due to Plaintiff's DVT diagnosis, Dr. Myers planned to treat Plaintiff with anticoagulant medication (*Id.* at 544). When Plaintiff returned to Pinckneyville on December 14, 2021, a nurse practitioner planned to administer two anticoagulants to Plaintiff for 30 days and run prothrombin time/international normalized ratio (PT/INR) tests (*Id.* at 79). PT/INT is a test that assesses whether a blood clot is subsiding and therefore assesses the progression of DVT (*Id.* at 3).

Plaintiff remained in Pinckneyville's infirmary from December 14, 2021, to January 5, 2022 (*Id.* at 80-81, 161-177). During Plaintiff's three-week stay in the infirmary, nurses visited him 2-3 times a day to administer Plaintiff's medications and assess his progress (*Id.*). During those three weeks, Plaintiff showed minimal to no signs or symptoms of

acute distress, discomfort, or pain (*Id.*). On December 16, 2021, Plaintiff requested a low bunk/low gallery permit due to his leg (*Id.* at 160). In Plaintiff's deposition, he clarified that he did not need the low bunk/low gallery permit while in the infirmary but was requesting the permit for when he returned to the general prison population (Doc. 37-2, p. 6). Dr. Myers neither confirmed nor denied Plaintiff's requests for a low bunk/low gallery permit while in the infirmary (*Id.* at 6-7).

During Plaintiff's three-week stay in the infirmary, Plaintiff saw Dr. Myers on two occasions. First, on December 22, 2021, Dr. Myers saw Plaintiff and charted Plaintiff's minimal foot pain, his reduction in foot swelling, the results of Plaintiff's PT/INR test, an adjustment of Plaintiff's medication, and an order that Plaintiff should remain in the infirmary (Doc. 37-1, p. 165). Dr. Myers saw Plaintiff again in the infirmary on December 29, 2021 (*Id.* at 171). Dr. Myers observed Plaintiff's PT/INR results and Plaintiff's left foot swelling (*Id.*). Throughout Plaintiff's infirmary stay, Dr. Myers placed orders for Plaintiff's PT/INR tests and compression socks for Plaintiff's leg (*Id.* at 164, 170). Plaintiff informally mentioned his low bunk/low gallery request to Dr. Myers as Dr. Myers visited the infirmary about once a week, but Dr. Myers did not confirm nor deny these requests at the time (Doc. 37-2, p. 6-7).

On January 5, 2022, Dr. Myers discharged Plaintiff from the infirmary (Doc. 37-1, at 178). Dr. Myers noted that Plaintiff had been stable since his admission to the infirmary and Plaintiff's PT/INR tests indicated that Plaintiff's DVT was in the therapeutic range (*Id.*). Dr. Myers discontinued Plaintiff's Lovenox medication but continued all other medications and enrolled Plaintiff in the general medicine chronic clinic for DVT (*Id.*).

While Plaintiff was back in the general prison population, he moved between several bunk arrangements, sometimes in a low bunk and low gallery, sometimes in a high bunk and second floor gallery (Doc. 37-2, pp. 8-10). Plaintiff spent at least two straight months in a top bunk (*Id.* at p. 9). On February 14, 2022, Plaintiff submitted a grievance for a low bunk/low gallery permit (Doc. 29-1, p. 15). The Health Care Unit Administrator (HCUA) denied this grievance (*Id.*). The HCUA noted that they did not see a note from Dr. Myers previously denying Plaintiff a low bunk permit, but Plaintiff's file also did not indicate a medical need for the permit (*Id.*).

From March 3, 2022, to April 15, 2022, Plaintiff was seen both in nurse sick call and by Dr. Myers (*see* Doc. 37-1, pp. 10-12). On March 4, 2022, Plaintiff was seen for right foot pain (his DVT had been in his left lower extremity) and again requested a low bunk/low gallery permit (*Id.* at 189). Plaintiff injured his right foot from either mounting or dismounting from the top bunk (Doc. 37-1, p. 190). On March 8, 2022, Dr. Myers saw Plaintiff for his right foot pain (*Id.* at 191-92). Dr. Myers noted that Plaintiff's foot pain had subsided from pain medication, and Dr. Myers also treated Plaintiff for chest pain (*Id.*). Nurses continued to see Plaintiff in nurse sick call in March and April (*Id.* at 189, 190, 198, 201, 203). The nurses noted that Plaintiff did not show signs of distress, discomfort, or pain, and his vitals were stable (*See id.*). On April 2, 2022, Plaintiff was seen in nurse sick call for a complaint of left leg swelling—the same leg that had DVT—then was referred to Dr. Myers, who saw Plaintiff on April 5, 2022 (*Id.* at 203, 205).

April 5, 2022, was Plaintiff's last visit to Dr. Myers at Pinckneyville (*Id.* at 12). On April 5, 2022, Dr. Myers observed that Plaintiff's left leg was larger than his right leg (*Id.*

at 205). Because of Plaintiff's history with DVT, Dr. Myers ordered a PT/INR test for Plaintiff to take that day as well as compression socks, Selsun blue, a corticosteroid called triamcinolone cream, an antifungal called miconazole nitrate cream, Tylenol, and PT/INR testing every month for 12 months (*Id.* at 205). Plaintiff stated in his deposition that he also requested the low bunk/low gallery permit informally when he saw Dr. Myers outside of the infirmary, either on March 8, 2022, or April 5, 2022, as those were the last two times that Dr. Myers saw Plaintiff at Pinckneyville (*Id.* at 191-92, 205; Doc. 37-2, p. 11). In his deposition, Plaintiff explained his reasoning for his low bunk/low gallery permit requests:

> Well, my leg was just – it was still swollen and it was still sore and everything. And it wasn't too much – I pretty much didn't like the top bunk. I mean, the top bunk, I had to climb up and down because – it's kind of hard climbing up and down and getting up in them bunks.

(Doc. 37-2, p. 12).

Nurses continued to monitor Plaintiff and administer his medications twice a day from April 8, 2022 to May 3, 2022 (*Id.* at 206-238). Plaintiff's medical records indicate that Plaintiff did not show signs of acute pain, distress, or discomfort during this time (*See id.*). Plaintiff was transferred to Menard Correctional Center about a year later, on April 15, 2023 (*Id.* at 256).

## PROCEDURAL HISTORY

On February 27, 2026, Dr. Myers filed the instant motion for summary judgment (Docs. 36, 37). Plaintiff never filed a response in opposition to this motion. Instead, Plaintiff filed a motion for recruitment of counsel nearly six months after Dr. Myers filed

his motion for summary judgment (Doc. 39). The Court denied Plaintiff's motion on August 31, 2026, citing the procedural posture of the case and Plaintiff's failure to demonstrate that he made a reasonable effort to obtain counsel on his own (Doc. 40). On September 15, 2026, Plaintiff filed another motion for recruitment of counsel (Doc. 41). The Court will address Plaintiff's renewed motion for recruitment of counsel first before turning to the motion for summary judgment.

## MOTION FOR COUNSEL

When presented with a request to appoint counsel, the Court must make the following inquiries: (1) has the indigent plaintiff made a reasonable attempt to obtain counsel or effectively been precluded from doing so, and (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself. *Pruitt v. Mote*, 503 F.3d 647, 654-55 (7th Cir. 2007). Again here, Plaintiff has not met the threshold burden of showing that he made a reasonable attempt to obtain counsel on his own. Plaintiff indicated that he reached out to the American Civil Liberties Union (ACLU) and the Uptown Peoples Law Center ("UPLC"). Both organizations declined Plaintiff's requests (Doc. 41). The ACLU explained that it cannot represent Plaintiff "due to our work on large class action cases" (*Id.* at 2). The UPLC, according to its website, "does not regularly take on individual cases" and its representation is "highly selective." UPTOWN PEOPLE'S LAW CENTER, Prisoners' Rights Program, https://www.uplcchicago.org/what-we-do/prison/prison-work.html (last visited Sept. 28, 2026). Contacting only two organizations, both of which are highly unlikely to accept his case due to the nature and scope of their work, does not constitute a reasonable attempt to obtain counsel.

Moreover, neither of Plaintiff's two requests for counsel say anything about his individual circumstances or why he would be unable to litigate this case on his own (*See* Docs. 39, 41). There is simply no information from which the Court can assess whether Plaintiff is capable of litigating this case on his own. Additionally, the timing of Plaintiff's recent requests for counsel are problematic. Plaintiff did not make the initial request for recruitment of counsel until nearly six months *after* Dr. Myers filed his motion for summary judgment, which Plaintiff failed to respond to (*Compare* Doc. 36 *with* Doc. 39). In sum, Plaintiff failed to show that he made a reasonable attempt to secure counsel on his own, failed to provide the Court any information to assess whether he is capable of litigating this case on his own, and mad his requests far too late after Dr. Myers filed his motion for summary judgment. Accordingly, Plaintiff's motion for recruitment of counsel (Doc. 41) is DENIED.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper only if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Instead, the court's task is to view the record and draw all reasonable inferences in the light most favorable to the non-moving party and decide if there is a genuine material dispute of fact that requires a trial. *Stewart*, 14 F.4th at 760; *Hansen v.*

*Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014). "Only if the court can say, on that sympathetic reading of the record, that no finder of fact could reasonably rule in the unsuccessful movant's favor may the court properly enter summary judgment against that movant." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015).

Plaintiff's failure to respond to the motion for summary judgment is deemed an admission that Dr. Myers' version of the facts is true. SDIL-LR 56.1(g). However, when "a nonmovant fails to respond to a motion for summary judgment, the movant 'still ha[s] to show that summary judgment was proper given the undisputed facts,' with those facts taken as usual in the light most favorable to the nonmovant." *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (quoting *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 543 (7th Cir. 2011)).

## DISCUSSION

The Eighth Amendment's prohibition against cruel and unusual punishment includes a right to adequate medical care for prisoners. *Berry v. Peterman*, 604 F.3d 435, 439 (7th Cir. 2010) *citing Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). Prison officials violate this prohibition when there is evidence demonstrating that: (1) Plaintiff suffered an objectively serious medical condition, and (2) Defendant knew about and was deliberately indifferent to Plaintiff's serious medical condition. *See Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 614 (7th Cir. 2022). For the purposes of summary judgment, Dr. Myers does not dispute that Plaintiff has a serious medical condition in his leg (*see* Doc. 37). Therefore, the only question for the Court is whether the evidence, when viewed in a light most favorable to Plaintiff, establishes an issue of fact as to whether Dr. Myers was

deliberately indifferent to Plaintiff's DVT treatment and request for a low bunk/low gallery permit.

A culpable state of mind for deliberate indifference requires that a prison official disregard a substantial risk of harm to the prisoner. *See Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). As a result, the standard for deliberate indifference is "essentially a criminal recklessness standard, that is, ignoring a known risk." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (citing *Johnson v. Snyder*, 444 F. 3d 579, 585) (7th Cir. 2006) (internal quotations omitted). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet*, 439 F.3d at 396. Because the standard for deliberate indifference is a high bar, "[n]egligence does not meet this standard." *Id.* However, just because a prisoner receives some treatment does not necessarily mean that the prison official afforded the prisoner adequate medical care. *See Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) ("That the prisoner received some treatment does not foreclose his deliberate indifference claim if the treatment received was 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition.'") (internal citations omitted).

i. *Medical treatment*

Plaintiff claims that Dr. Myers was deliberately indifferent in his treatment of Plaintiff's leg (Docs. 1, 10). However, there is no evidence in the record to show that Dr. Myers "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Farmer v. Brennan*,

511 U.S. 825, 837 (1994)) (internal quotations omitted). When Dr. Myers initially suspected that Plaintiff might have DVT, he immediately sent Plaintiff to the Pinckneyville Community Hospital for testing, which Plaintiff received that same day (Doc. 37-1, p. 79). Also on the same day, when Plaintiff returned from the hospital, Dr. Myers established a treatment plan for Plaintiff (*Id.* at 544). Dr. Myers kept Plaintiff in the infirmary for three weeks, checking in weekly and ordering treatment for Plaintiff (*Id.* at 164, 165, 170, 171). Once Plaintiff was out of the infirmary, Dr. Myers continued to treat Plaintiff's swollen left leg, and pain in his right foot and chest (*Id.* at 191-92, 203, 205). On Plaintiff's final visit with Dr. Myers, Plaintiff complained of left leg swelling (*Id.* at 203-205). Because Dr. Myers was familiar with Plaintiff's history of DVT, Dr. Myers treated Plaintiff with new medications, a compression sleeve, and a DT/INT test (*Id.*).

The undisputed evidence indicates that each time Plaintiff saw Dr. Myers for medical treatment, Dr. Myers quickly and adequately responded to Plaintiff's medical needs. *Cortez v. Apostol*, No. 3:16-cv-1397-GCS, 2020 WL 584097, at *5 (S.D. Ill. Feb. 6, 2020) ("The record reveals that [Defendant] from late 2015 to 2016 provided appropriate medical treatment to [Plaintiff]. Dr. [Defendant] routinely saw, examined, treated, and prescribed orders and medications."); *Jackson v. Brookhart*, No. 3:22-cv-00147-GCS, 2026 WL 2532202, at *6 (S.D. Ill. Aug. 27, 2026) (granting summary judgment to defendant whose "actions demonstrate ongoing attention to Plaintiff's medical concerns and an effort to investigate and address his complaints. There is nothing to suggest the treatment Plaintiff received from [defendant] was 'so blatantly inappropriate as to evidence intentional mistreatment."). In fact, Plaintiff's medical records point to a subsiding of

Plaintiff's DVT through his infirmary stay and minimal to no pain or distress in March and April 2022 (Doc. 37-1, pp. 80-81; 161-177; 206-238).

In his deposition, Plaintiff was asked what kind of treatment Dr. Myers could have provided for him that Dr. Myers did not provide (Doc. 37-2, p. 12). The only thing Plaintiff identified was that he believed Dr. Myers could have given him a low bunk/low gallery permit and a crutch (*Id.*). Plaintiff stated: "my leg was just—it was still swollen and it was sore and everything. And it wasn't too much—I pretty much didn't like the top bunk." (*Id.*). The medical records indicate that Plaintiff's leg was not causing Plaintiff acute discomfort or pain (Doc. 37-1, pp. 206-238). The thrust of Plaintiff's claim, as revealed by his deposition, focuses on the low bunk/low gallery permit rather than the treatment he received (*See* Doc. 37-2). Simply put, there is no evidence in the record that shows or would even infer that Dr. Myers was deliberately indifferent in his treatment of Plaintiff. *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (quoting *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir. 1974)). ("A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition.'").

In sum, there is no evidence from which a reasonable jury could conclude that Dr. Myers' medical treatment of Plaintiff's amounted to deliberate indifference. Dr. Myers is entitled to summary judgment on this aspect of Plaintiff's claim.

ii. *Low bunk/low gallery permit*

To determine whether Dr. Myers' refusal to issue Plaintiff a low bunk/low gallery permit constituted an Eighth Amendment violation, the question for the Court "is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" *Farmer v. Brennan*, 511 U.S. 825, 843 (1994). The IDOC criteria for granting a low bunk/low gallery permit for a prisoner are as follows: (1) obese over 350 pounds; (2) seizures; (3) uses assistive devices or prosthetic limbs; (4) is over 65 years old; and (5) hemi paralysis (stroke) (Doc. 37-1, p. 13). If a prisoner does not fit the specific criteria provided by IDOC, a physician, nurse practitioner, or physician assistant can use their own medical judgment to grant a low bunk/low gallery permit if the medical professional determines the permit is medically necessary (*Id.*).

Plaintiff first requested a low bunk/low gallery permit on December 16, 2021, at the very start of his three week stay in the infirmary (*Id.* at 160). The low bunk/low gallery permit was not medically necessary at that time because, as Plaintiff indicated, he did not need a low bunk/low gallery permit while in the infirmary and was only asking for a permit for his eventual return to the general prison population (Doc. 37-2, p. 6). Despite Plaintiff's continual, informal requests to Dr. Myers of a low bunk/low gallery permit while in the infirmary (*Id.* at 6-7), Plaintiff admits there was no medical need for the permit at the time (*Id.*).

Plaintiff again requested a low bunk/low gallery permit on February 14, 2022, through the prison grievance process (Doc. 29-1, p. 15). This request was denied because

the HCUA found there was no medical indication that Plaintiff needed a low bunk/low gallery permit (*Id.*). Plaintiff requested a low bunk/low gallery permit for a third time on March 4, 2022, while being seen in nurse sick call (Doc. 37-1, p. 189). Plaintiff stated in his deposition that he also requested the permit informally when he saw Dr. Myers outside of the infirmary, either on March 8, 2022, or April 5, 2022, as those were the last two times that Dr. Myers saw Plaintiff at Pinckneyville (*Id.* at 191-92, 205; Doc. 37-2, p. 11). Plaintiff's medical records from March and April 2022 indicate that he had no leg pain, redness, or warmth, though he did experience some chest pain (*See* Doc. 37-1, pp. 189; 193; 198-99; 201; 203; 205-226; 232-235).

Simply put, Plaintiff's medical records do not indicate an acute pain, injury, or change in DVT status that would make a denial of a low bunk/low gallery permit a reckless treatment choice (Doc. 37-1, pp. 189; 193; 198-99; 201; 203; 205-226; 232-235). *See also Cortez*, 2020 WL 584097, at *5 (concluding that medical records did not support plaintiff's "subjective complaints" and physician was not deliberately indifferent in denying plaintiff's request for a low bunk permit). Nor is there any evidence to suggest Dr. Myers' decision to not grant Plaintiff's request for a low bunk/low gallery permit exposed Plaintiff to "an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Plaintiff never testified that he was *unable* to climb into the top bunk. Rather, Plaintiff testified that he had some difficulty doing so, but that was largely due to the configuration of the cell and he did not attribute that to his medical condition. *Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) (affirming the district court's granting

of summary judgment because Plaintiff did not offer evidence that the top bunk "would show the requisite level of risk and harm" to Plaintiff's existing medical condition.)[1]

In fact, Plaintiff testified that his interest in a low bunk/low gallery permit was more of a preference than a medical need:

> Well, my leg was just – it was still swollen and it was still sore and everything. And it wasn't too much – I pretty much didn't like the top bunk. I mean, the top bunk, I had to climb up and down because – it's kind of hard climbing up and down and getting up in them bunks.

(Doc. 37-2, p. 12).

An unfulfilled preference for a low bunk is not the type of treatment the Eighth Amendment was intended to prevent. Indeed, Prisoners are not entitled to demand specific care. *Arnett*, 658 F.3d at 754. There is simply no evidence in the record that Plaintiff's left leg DVT or right foot injury presented an acute injury, pain, or distress such that Plaintiff had a medical reason for a low bunk/low gallery permit. *Snipes*, 95 F.3d at 593 (explaining that even when a prisoner has a condition, such as a sore toe, the fact that Plaintiff must take precautions to ensure the prison shower does not worsen the toe, "do[es] not ignite a constitutional claim.").

Construing the evidence in the light most favorable to Plaintiff, the Court finds that no reasonable jury could conclude that Dr. Myers was deliberately indifferent in his

---

[1] *But see Withers v. Wexford Health Sources, Inc.*, 710 F.3d 688, 690 (7th Cir. 2013) (finding a nurse deliberately indifferent towards Plaintiff's medical condition when Plaintiff fell out of the top bunk); *Palmer v. Franz*, 928 F.3d 560, 565 (7th Cir. 2019) (finding an issue of fact where Plaintiff's medical condition made him unable to climb into the top bunk, causing him to fall out of the bunk, which Defendant knew of but did not take any affirmative steps to mitigate the risk of the top bunk). Here, there is no evidence that Plaintiff ever fell as a result of trying to climb to his top bunk or was otherwise unable to access the top bunk.

medical treatment of Plaintiff or Dr. Myers' refusal to issue Plaintiff a low bunk/low gallery permit. Thus, the Court finds that Dr. Myers is entitled to summary judgment.

## CONCLUSION

Plaintiff Billy Miles' renewed motion for recruitment of counsel (Doc. 41) is **DENIED.** Defendant Percy Myers' motion for summary judgment (Doc. 36) is **GRANTED.** Plaintiff's claim is **DISMISSED with prejudice** and judgment will be entered in Dr. Myers' favor. The Clerk of Court is **DIRECTED** to enter judgment and close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: September 28, 2026**

Mark A. Beatty

**MARK A. BEATTY**
**United States Magistrate Judge**